54 CCPA
## Application of Jack K. DALE.
### Patent Appeal No. 7726.

United States Court of Customs and
Patent Appeals.

May 25, 1967.

Edward G. Jones, Joseph K. Andonian, Kalamazoo, Mich. (Eugene O. Retter, Kalamazoo, Mich., of counsel), for appellant.

Joseph Schimmel, Washington, D. C., (Fred W. Sherling, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

The issue to be decided concerning the rejection of appealed claims 1, 2, 16, and 17, is stated in the solicitor's brief as follows:

> The issue to be decided in this case is whether the differences between the compositions sought to be patented and the prior art are such that the com-

positions as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said compositions pertain, 35 U.S.C. 103.

The invention in issue is disclosed [1] as a therapeutic composition containing hydrocortisone and neomycin as active ingredients. The four claims on appeal, relating generally to a therapeutic composition, appear to stand or fall together. They are:

1. A therapeutic composition comprising hydrocortisone free alcohol and neomycin.

2. A topical therapeutic composition comprising hydrocortisone free alcohol and neomycin dispersed in a vehicle suitable for topical application.

16. A therapeutic composition comprising hydrocortisone free alcohol and neomycin sulfate.

17. A therapeutic composition comprising sodium hydrocortisone hemisuccinate and neomycin sulfate.

### The Rejection

The disclosures relied upon to support the rejection are found in the following references:

Reichstein 2,183,589 Dec. 19, 1939

Lepri, "Studies on Cortisone in Ophthalmology", 35 Am.J.Ophthalmology 935–946 (1952);

Modern Drugs 293 (Jan. 1953);

Boland, "Hydrocortisone," 13 J.Am. Ph.Assn. 540–544 (1952);

Gordon, "Status of Corticotropin, Cortisone and Hydrocortisone * * *" Brit.J.Opthalmology 85–98 (Feb. 1953);

Merck, "Cortone and Hydrocortone", (Apr. 1953).

The composition covered by the claims contains two active ingredients: 1) "hydrocortisone free alcohol" or "sodium hydrocortisone hemisuccinate," and 2) neomycin. Appellant's specification points out that the word "hydrocortisone" is

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. In Ser. No. 458,679, filed September 27, 1954.

used to mean 17 α–hydroxycorticosterone and its therapeutically active derivatives, such as the 21–esters including the acetate, the cyclopentylproprionate and others, and the 9 α–halo derivatives, especially 9 α–fluorohydrocortisone and 9 α–chlorohydrocortisone, and the therapeutically active derivatives, e. g., esters, thereof. It also includes the water soluble derivatives of these compounds, such as the hemisuccinates, e. g., sodium hydrocortisone hemisuccinate.

The word "neomycin" is also disclosed as meaning the antibiotic more fully described in Waksman, Neomycin (Rutgers University Press, 1953). It includes the various forms of neomycin (such as the B and C forms) and their therapeutically active derivatives (such as the sulfate and hydrochloride salts).

The composition claimed is prepared by mixing the two active ingredients. Generally the mixture is prepared in a vehicle suitable for the particular use to which the composition is to be put. When the composition is to be used topically it is generally prepared in an ointment base. It can also be prepared as a lotion or jelly for topical use. It is generally prepared in a sterile vehicle when the use intended is ophthalmic or requires parenteral injection. It is prepared in an aerosol type vehicle when intended for use as a nasal spray. It can be prepared in the form of a powder or tablet for vaginal and similar uses.

The solicitor's position, as stated in his brief, is that the prior art references are pertinent to the issue as follows:

(1) The Reichstein et al. patent * * * disclosed suparenal cortical hormones containing at least one group which is convertible to a hydroxyl group and cortisone actetate (claims 7 and 16 * * *). Example 6 of the reference refers to the preparation of cortisone hemisuccinate * * *. Appellant agrees that Reichstein suggests the hemisuccinate of hydrocortisone * * *.

(2) The Lepri article discloses an *in vitro* study to determine whether cortisone (cortisone acetate was actually utilized) interferes with the action of such antibiotics as neomycin, penicillin, terramycin, and three other antibiotics * * *. The conclusion from the *in vitro* study was that "cortisone does not have any influence on the action of antibiotics on microorganisms" * * *. An *in vivo* study was performed to confirm this conclusion * * *. Experiments were performed to find out whether cortisone had any effect on the antibacterial efficacy of the antibiotic penicillin and terramycin * * *. The results of the experiments led to the conclusion that * *:

"The simultaneous administration of cortisone with penicillin and terramycin, which by themselves possess a considerable antibacterial activity in the experimental infection of the rabbit, seems to exert a favorable influence on the course of the infection by shortening its duration and causing an attenuation of the inflammatory signs."

Lepri finally concluded from his studies that * * *:

"The combined cortisone-antibiotic treatment, on the one hand, reduces considerably the symptoms due to the allergic exudative component of the infection and, on the other hand, acts directly on the infecting agent. This, theoretically at least, seems to be the therapy of preference for the infections of the anterior segment of the eye."

(3) The article by Boland * * * reports the effects of hydrocortisone given orally to patients with rheumatoid arthritis * * *. The free alcohol of hydrocortisone was found to have an antirheumatic potency "milligram for milligram, at least 50 per cent greater than that of cortisone acetate * * *. Also, the free alcohol was found to be "approximately twice as effective" as hydrocortisone acetate * * *.

(4) The "Neosone" advertisement * * * is directed to an ophthalmic ointment containing "cortisone for in-

flammation" and "neomycin for infection." The active ingredients are listed as cortisone acetate and neomycin sulfate. [Published in "Modern Drugs."]

(5) The Gordon article * * * discloses that hydrocortisone has been employed in a series of sixty cases "much in the same manner and in the same dosages as cortisone" * * *. The results with hydrocortisone are reported to be * * *:

"Systemically it appears to be more effective than cortisone in lesser concentrations (Alpert, 1952). Topically, its analgesic effect is the same or greater than that of cortisone. Administered subconjunctivally, it provokes less local reaction than cortisone."

(6) The Merck article * * * reports that hydrocortisone "appears to be the steroid with the most marked anti-inflammatory action at the tissue level" * * *. Except for the comment regarding hydrocortisone, the article appears to be directed to the use of hydrocortisone acetate.

Such are the facts of record offered by the Patent Office in support of the rejection. Appellant's position does not differ seriously from the solicitor's summary statement quoted above as to what the prior art discloses. However, appellant disagrees with the conclusion that such disclosures make the claimed invention obvious under 35 U.S.C. § 103. In support of this position appellant has submitted factual evidence to which we will now turn. Appellant relies on other teachings in the prior art from which it is concluded:

It is submitted that not only is the acetate ester of hydrocortisone the logical substitute for the acetate ester of cortisone insofar as structural chemical relationships are concerned, but that the above-quoted teachings of the art in reference to enhanced biological properties clearly say that the hydrocortisone acetate will provide more prolonged and enhanced effects. Surely, then, the principles of investigation in this art point the way for investigators to refrain from using the more soluble free alcohol and sodium hemisuccinate forms. This teaching of the art is clearly at odds with the position of the Examiner expressed throughout the prosecution, in his final rejection and in his answer. He contends that the more soluble forms of hydrocortisone are obvious choices in preparation of combination products, since such forms are the ones most likely to give enhanced beneficial biological properties, whether these properties be antibacterial or anti-inflammatory * * *. His contention is not supported, rather it is negatived by the publications of those skilled in the art.

* * *

Appellant also has submitted affidavits as factual evidence which we shall now consider. Basically these affidavits are relied upon to establish what appellant refers to as "evidence of unexpected antibacterial properties." Appellant in his brief refers to the "summary and conclusions" of the affidavit of one Wilkins as support for this position:

*Summary and Conclusions*

(1) Hydrocortisone free alcohol and an ester, hydrocortisone 21–hemisuccinate sodium salt, significantly increased the antibacterial effectiveness of neomycin.

(2) The combination of hydrocortisone and neomycin was approximately fifteen times more effective than neomycin alone.

(3) The free alcohol and 21–hemisuccinate sodium salt of prednisolone were equally effective as potentiating agents.

(4) The potentiation has been observed in two different media, in either agar or broth.

(5) The potentiation was entirely unexpected in view of the known properties of the individual ingredients.

In addition to the Wilkins affidavit, two Dale affidavits were introduced.

The first affidavit of Dale is directed to the preparation of an ointment containing hydrocortisone and neomycin in which the affiant alleges:

That, he is informed and believes that the ointment thus-prepared was sent to responsible and qualified investigators for clinical testing on humans and that he has seen the reports of the clinicians indicating that the ointment thus-prepared was clinically effective in the treatment of various skin disorders.

We will state at this point that the affidavit does not disclose the actual "reports of the clinicians" or allege any unexpected results in the treatment of skin disorders. The conclusion stated therein is what we think would be expected from the teachings of the prior art. For example, the statement is made in Merck that hydrocortisone appears to be the steroid with the most marked anti-inflammatory action at the tissue level.

The second affidavit of Dale shows the combination of hydrocortisone succinate and neomycin to be more effective than neomycin alone in reducing the bacteria count in the kidneys of white mice. The affidavit also reports the results of *in vitro* experiments showing the antibacterial activity of hydrocortisone with neomycin to be greater than the combination of cortisone acetate with neomycin.

After reviewing the affidavits, we find ourselves unable to agree with appellant that this evidence "clearly rebuts" the position of the Patent Office as to obviousness. Both Lepri and Modern Drugs disclose compositions containing neomycin and cortisone acetate. The latter teaches, "cortisone for inflammation, neomycin for infection * * * [a] OPHTHALMIC OINTMENT." Boland, Gordon, Merck and Reichstein disclose the equivalency of use of hydrocortisone and cortisone. And Boland, Gordon and Merck indicate the advantages of hydrocortisone over cortisone, including cortisone acetate. The fact which the references establish is that hydrocortisone is more potent than cortisone acetate.

Appellant argues that the prior art in this case does not teach that a class of anti-inflammatory steroids is "useful with or would potentiate the antibacterial action of neomycin." This argument is inconsistent with the disclosures in Modern Drugs which show that a combination of the anti-inflammatory steroid cortisone acetate with neomycin sulfate was placed on the market. We find nothing in the record to suggest that it would have been unobvious to Lepri, as a person of ordinary skill in this art, to use hydrocortisone instead of cortisone acetate in the Neosone preparation. The greater potency of the hydrocortisone was recognized by Boland who teaches that hydrocortisone is twice as potent as cortisone acetate. We think it would be obvious to one of ordinary skill in this art to make the proper substitution of the more potent hydrocortisone free alcohol for the cortisone acetate in Neosone.

We conclude, therefore, that it would have been obvious under the conditions stated in 35 U.S.C. § 103 for one of ordinary skill in this art to substitute hydrocortisone for cortisone in the Neosone preparation. We do not think the present record establishes an unexpected "potentiation effect" flowing from the use of hydrocortisone.

Since affirmance of this ground of rejection is dispositive of this appeal, we do not find it necessary to consider an additional ground of rejection based on the claims of two copending applications of appellant.

Affirmed.

WORLEY, C. J., did not participate.